UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

_____X

| | |
|---|---|
| SCOTT LUPIA, | CIVIL ACTION |
| Plaintiff, | NO. 1:21-cv-11077 |
| vs. | |
| NEW JERSEY TRANSIT RAIL OPERATIONS, INC., | |
| | December 27, 2021 |
| Defendant. | |

_____X

## COMPLAINT

### NATURE OF ACTION

1. The plaintiff brings this Federal Employers' Liability Act action against the defendant for injuries suffered by him while in the employ of the defendant Railroad. 45 U.S.C. 51 *et seq*.

### JURISDICTION

2. This Court has subject matter jurisdiction in this case pursuant to the Federal Employers' Liability Act, 45 U.S.C. § 51. Venue of this action in the Southern District of New York is proper because the defendant New Jersey Transit Rail Operations has extensive operations within the District at its Manhattan Pennsylvania Station and the negligent events occurred at that Penn Station location. 45 U.S.C. § 56.

### PARTIES

3. The plaintiff is of Denville, New Jersey.

4. The defendant, New Jersey Transit Rail Operations, Inc. (NJT Rail), is a railroad carrier corporation duly established by law with extensive offices and operations at Penn Station in New York City.

## FACTS

5. During all times herein mentioned, the defendant was a common carrier engaged in the business of interstate commerce, and as such, operated a railroad in such business between New York and New Jersey.

6. At the time the plaintiff received the injuries complained of, he was employed by the defendant Railroad as a locomotive engineer.

7. At the time the plaintiff received the injuries complained of the defendant Railroad was engaged in interstate commerce and the plaintiff was employed in furtherance of said commerce.

8. On or about July 21, 2020, the plaintiff was engaged in his duties as a locomotive engineer NJT Rail's Penn Station using equipment that was owned and/or operated and/or controlled and/or maintained by the defendant corporation or its agents.

9. On NJT, the locomotive engineers who operate passenger trains work alone in a small control cab. There is a small side window to the right of where the engineer sits, at head level, but NJT Operating Regulations require that an engineer's face and head cannot be exposed to any opening of that window, which for the plaintiff Scott Lupia means the window cannot be opened more than an inch or so.

10. To maintain a safe temperature for locomotive engineers to operate in hot and humid weather, the Federal Railroad Administration's (FRA) safety regulations require railroads to equip their locomotive cabs with an air conditioning unit and further

require that each such AC unit "shall be inspected and maintained to ensure it operates properly." 49 CFR 229.119(h).

11. On July 21, 2020, the plaintiff Scott Lupia was on duty as a locomotive engineer at NJT's Penn Station in Manhattan. It was a notably hot and humid day. His next train to operate was Train 6659, and at 6:40 PM its location at Track 3 was posted. He walked down to Track 3 and around 6:44 PM entered the cab of NJT locomotive #4627. He immediately noticed the temperature inside the cab was unusually high and the cab's air conditioning unit was not operating. He cut in the locomotive to see if he could liven up the AC unit, but it just began blowing hot air. Lupia's analog thermometer showed the temperature exceeded 100 degrees.

12. Lupia immediately reported the situation to the NJT Mechanical Department and asked for an electrician to come and correct the non-functioning AC unit. A Mechanical Department employee showed up and began working on the AC unit, but after several minutes was unable to get it working. Train 6659 was scheduled to soon depart at 6:57 PM, and so he called his Operating Department for a Supervisor to come assess the situation and provide further instruction.

13. Nobody showed, and at 6:50 PM Lupia made another call to NJT Supervision reporting the temperature in the cab was well over 100 degrees and he did not feel safe operating the passenger train in that condition. NJT Senior Trainmaster Sue Vassal then entered the cab with a heat measurement gun. She took several cab readings and said the temperature around the engineer's workspace was 114 degrees. The AC unit was still blowing hot air and the Mechanical Department employee said he could not fix it. Lupia told Senior Trainmaster Vassal it was dangerous to operate in that

condition, especially since once the train exited the Hudson Tunnel the temperature would spike even more.

14. Senior Trainmaster Vassal then called Chief Trainmaster Malik Little and explained the cab temperature was 114 degrees and the AC unit was not functioning properly. Lupia overheard Little ordering Vassal to make Lupia take the train out regardless. Lupia then told Vassal he had a specific health condition that could make it even more dangerous to operate in such heat, and Vassal relayed that information to Little. But Chief Trainmaster Little still ordered Vassal to order Lupia to take the train out.

15. On her recorded radio channel, Vassal then ordered Lupia to operate the train. Lupia knew that on NJT refusing a direct order constitutes insubordination resulting in termination. So as not to lose his career, Lupia repeated the order over the radio and stated he would comply despite the cab temperature reading 114 degrees.

16. NJT Passenger Train 6659 left Penn Station on time at 6:57 PM with Lupia operating alone in the cab. The AC unit continued not to operate properly, and the temperature continued to rise as the train proceeded west. As the Train was leaving Short Hills Station Lupia felt light-headed, nauseous, and had difficulty breathing. He vomited the water he tried to drink. As the Train approached Summit Station, he began to lose consciousness. He made an emergency radio transmission and dumped the Train into emergency just before completely passing out. The cab video shows that after Lupia lost conscious his body fell to the left with his head slamming into the metal frame edge of the other seat. He then hit the floor and remained motionless.

17. The Conductor in Lupia's train was William Pfeiffer. While pulling into Summit Station Pfeiffer heard Lupia requesting an ambulance over the radio. Pfeiffer tried to make radio contact with Lupia without success. Pfeiffer then walked up to the locomotive cab and found Lupia sprawled unresponsive on the floor. Police and ambulance personnel showed up and transported Lupia to the nearest Hospital.

18. As a result of NJT's failure to provide the plaintiff Scott Lupia with a reasonably safe place to work and to comply with applicable federal safety statutes and regulations, he has suffered, *inter alia,* heat exhaustion with loss of consciousness, severe concussion with post-concussion syndrome, traumatic perilymph fistulas, and cervical disc herniation with C4-5 and C5-6 anterior cervical fusion surgery, all resulting in severe and disabling symptoms, extended medical treatment with multiple surgeries, and permanent impairment and disfigurement.

## **AS AND FOR A FIRST CAUSE OF ACTION**

19. The plaintiff adopts by reference and realleges each and every allegation set forth in paragraphs 1 through 18 of this Complaint with the same force and effect as if set forth under this cause of action.

20. The defendant Railroad, its agents, servants, and employees were negligent in one or more of the following ways:

a. Failing to inspect a locomotive cab air conditioning unit to confirm it was operating properly;

b. Failing to maintain a locomotive cab AC unit to ensure it was operating properly;

c. Failing to repair a locomotive cab AC unit to ensure it operated properly;

5

    d. Failing to comply with Federal Rail Administration safety regulation 49 U.S.C.229.119(h);

    e. Failing to determine that a locomotive was not safe to operate given the non-functioning of its cab AC unit;

    f. Failing to provide an alternate locomotive with a properly operating AC unit in its cab;

    g. Failing to cancel Train 6659 given its locomotive cab did not have a properly operating AC unit;

    h. Failing to act in a reasonably prudent manner under all the facts and circumstances.

    21. As a result of the negligence of the defendant Railroad, its agents, servants, or employees, the plaintiff was injured.

    22. As a result of the failure of the defendant Railroad, its agents, servants, or employees to use reasonable care to provide the plaintiff with a safe place in which to work, the plaintiff was injured.

    23. As a result of all his injuries, the plaintiff has suffered and will suffer lost wages and benefits, impairment to earning capacity, medical expenses, pain and suffering, disfigurement, and mental anguish.

## AS AND FOR A SECOND CAUSE OF ACTION

    24. The plaintiff adopts by reference and realleges each and every allegation set forth in paragraphs 1 through 18 of this Complaint with the same force and effect as if set forth under this cause of action.

25. The Locomotive Inspection Act, 49 U.S.C. 20701 *et seq*, prohibits railroad carriers from using or allowing to be used locomotives whose parts and appurtenances are not in proper condition and safe to operate without unnecessary danger of personal injury to employees. The Locomotive Inspection Act is violated when a railroad employee is injured in whole or in part due to any part or appurtenance of a locomotive failing to operate as intended.

26. As a result of the failure of the defendant Railroad, its agents, servants, or employees to provide the plaintiff with a locomotive with all its parts and appurtenances able to function as intended, the defendant Railroad violated the Locomotive Inspection Act, 49 U.S.C. §§20701 *et seq*.

27. As a result of the said violation, the plaintiff was injured. As such, the defense of contributory negligence is not available to the defendant Railroad per 45 U.S.C. 53.

28. As a result of the said injuries, the plaintiff has suffered and will suffer lost wages and benefits, impairment to earning capacity, medical expenses, pain and suffering, mental anguish and disfigurement.

WHEREFORE, in order to fairly and justly compensate the negligently injured plaintiff and thereby promote safe operating conditions on the defendant Railroad, the plaintiff demands a judgment for money damages against the defendant Railroad in addition to any further relief the Court deems just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY**

BY HIS ATTORNEYS,

*Stephen J. Fitzgerald*
Stephen J. Fitzgerald [SF3050]
Garrison, Levin-Epstein, Fitzgerald
    & Pirrotti, P.C.
405 Orange Street
New Haven, CT  06511
Tel: (203) 777-4425
Fax: (203) 776-3965
E-mail: sfitzgerald@garrisonlaw.com

and

Charles C. Goetsch [CG9082]
Charles Goetsch Law Offices, LLC
405 Orange Street
New Haven, CT 06511
Tel: (203) 672-1370
Fax: (203) 776-3965
Email: charlie@gowhistleblower.com