UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                            :

SCOTT LUPIA,                        :

                   Plaintiff,         :

                                            :                21-cv-11077 (LJL)

       -v-                       :

                                          :          OPINION AND ORDER

NEW JERSEY TRANSIT RAIL OPERATIONS, INC.,  :

                                          :

                 Defendant.      :

                                          :

----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant New Jersey Transit Rail Operations, Inc. ("Defendant" or "NJT") moves for summary judgment against Plaintiff Scott Lupia ("Plaintiff" or "Lupia").  Dkt. No. 36.  For the following reasons, the motion for summary judgment is granted in part and denied in part.

## BACKGROUND

      The following undisputed facts are drawn from the parties' statements of material facts submitted pursuant to Local Rule 56.1 and the evidence submitted in connection with the motion for summary judgment and are construed in favor of the non-moving party.  Dkt. No. 37 at 5; Dkt. No. 39-1.

      At the time of the events alleged in the complaint, Lupia was employed as a locomotive engineer in the Hoboken Division of NJT.  Dkt. No. 39-1 ¶ 1; *see also* Dkt. No. 12 ¶ 3.  On July 21, 2021, Lupia entered the cab of his assigned locomotive ("Engine 4627") of his train ("Train 6659") at Penn Station and discovered that the cab air conditioning ("A/C") unit was not working.  Dkt. No. 39-1 ¶ 1.  Lupia notified the Senior Train Master Sue Walker ("Walker"), who measured the cab's temperature at 114 degrees Fahrenheit.  *Id*.  NJT sent mechanical personnel to his cab, but they were unable to repair the A/C unit, which according to the

railroad's service records, had first been reported inoperable six weeks earlier. *Id.* Train 6659 had been commissioned on or around 2001. Dkt. No. 37 at 5 ¶ 7; Dkt. No. 38 ¶ 5.

After observing the conditions in the cab, Walker called her supervisor, Chief Train Master Malik Little ("Little"). Dkt. No. 39-1 ¶ 2. Walker told Little that the A/C unit was broken and could not be repaired. She also told Little that the temperature in the cab was 114 degrees Fahrenheit. *Id.* Little nonetheless ordered Lupia to operate the train as scheduled. *Id.* At the time that Little made this order, he knew of prior instances in which NJT engineers required medical assistance after operating a train when the ambient cab temperature was above 100 degrees. *Id.* Little also believed that NJT prohibited locomotive engineers from refusing to operate a locomotive without A/C. *Id.* According to Little, if the engineer refused to operate the locomotive with inoperable A/C, he or she could be charged with insubordination and fired. *Id.*

Approximately forty minutes after departing from Penn Station, Lupia collapsed from heat exhaustion. *Id.* ¶ 3. He was found unresponsive on the floor of the cab. *Id.* Video from the cab shows Lupia slumping to his left, falling out of his chair, and hitting his head and neck on hard metal surfaces. *Id.* He was diagnosed with head and neck injuries which required extensive medical treatment and resulted in permanent career-ending disabilities. *Id.*; Dkt. No. 37 at 5 ¶ 2.

**PROCEDURAL HISTORY**

Plaintiff filed his complaint on December 27, 2021. Dkt. No. 1. His complaint alleges that Defendant violated the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.* Plaintiff asserts two causes of action under FELA. The first cause of action alleges that Defendant was negligent in one or more of the following ways: (1) failing to inspect the locomotive cab A/C unit to confirm it was operating properly; (2) failing to maintain the A/C unit to ensure it was operating properly; (3) failing to repair the A/C unit to ensure it operated properly; (4) failing to determine that the locomotive was not safe to operate given that the A/C

unit was not functioning; (5) failing to provide an alternate locomotive with a properly operating A/C unit; and (6) failing to cancel the train given that the locomotive cab did not have a properly operating A/C unit.  Dkt. No. 1 ¶ 20.[1]  Plaintiff alleges that Defendant failed to use reasonable care to provide Plaintiff with a safe place in which to work.  *Id.* ¶ 22.  Plaintiff's second cause of action alleges that Defendant violated FELA by failing to provide Plaintiff with a locomotive with all its parts and appurtenances safe to operate as intended in violation of the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701 *et seq.*, and that as a result of such violation, Plaintiff was injured.  *Id.* ¶¶ 25–27.

Defendant filed its answer on February 17, 2022.  Dkt. No. 12.  Defendant sought leave to file a third-party complaint on October 11, 2022, Dkt. No. 26, and after subsequent briefing, Dkt. Nos. 29, 33, the Court denied that motion by opinion and order on October 31, 2022, Dkt. No. 35.  Finally, Defendant filed this motion for summary judgment and accompanying declaration on November 1, 2022.  Dkt. No. 36.  Plaintiff filed its opposition to the motion for summary judgment on November 11, 2022.  Dkt. No. 39.  Defendant filed its reply in support of its motion for summary judgment on November 15, 2022.  Dkt. No. 40.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[1] Plaintiff also alleges that Defendant failed to comply with an FRA safety regulation governing the inspection of A/C units, 49 C.F.R. § 229.119(h).  However, in connection with its submissions on this motion, Plaintiff does not dispute that such regulation was not applicable to Train 6659, and accordingly, as set forth below, the Court grants Defendant summary judgment on this part of Plaintiff's claim.

242, 248 (1986).  And "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "[I]n assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

The party seeking summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  To survive summary judgment, the nonmoving party "may not rely on mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)), and must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  But if "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

## DISCUSSION

Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the basis that (i) A/C units do not qualify as a "part" or "appurtenance" under the LIA; (ii) the Federal Railroad Administration ("FRA") regulation cited in Plaintiff's complaint, 49 C.F.R. § 229.119, does not apply because Train 6659 entered into service prior to June 8, 2012; and (iii) the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20102 *et seq.*, precludes Plaintiff's claims. Dkt. No. 37. For the following reasons, the Court grants the motion in part and denies it in part.

## I.    The Locomotive Inspection Act

Initially enacted in 1911 as the Boiler Inspection Act ("BIA"), the LIA makes it unlawful to use a "locomotive or tender on [a railroad carrier's] railroad line" when the "parts and appurtenances" of such locomotive or tender are not, *inter alia*, "in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701.[2] The current version of statute provides that:

---

[2] The BIA, the predecessor of the LIA, only applied to the boiler of the locomotive. *See Napier v. Atl. Coast Line R. Co.*, 272 U.S. 605, 611 (1926) (describing the history of the legislation and quoting statutory language that applied only to "safe and suitable boilers and appurtenances thereto"); *see also* Act of Feb. 17, 1911, ch. 103, 36 Stat. 913. The BIA was later "extended in 1915 to 'include the entire locomotive and tender and all parts and appurtenances thereof.'" *Napier*, 272 U.S at 608; *see also* Act of March 4, 1915, ch. 169, 38 Stat. 1192. Upon amendment, the "Boiler Inspection Act" took on the moniker of the "Locomotive Inspection Act." In 1924, the relevant section was again amended to read:

That it shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of this act and are able to withstand

> A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances--
>
> (1) are in proper condition and safe to operate without unnecessary danger of personal injury;
>
> (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
>
> (3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701.[3]  This provision has been read as coextensive with regulations of the FRA,

under which the FRA may impose certain civil monetary penalties against violators.  *See* 49

C.F.R. § 229.7;[4] *see also Transportation Div. of Int'l Ass'n of Sheet Metal, Air, Rail v. Fed. R.R.*

---

> such test or tests as may be prescribed in the rules and regulations hereinafter provided for.

*Napier*, 272 U.S. at 608; *see also* Act of June 7, 1924, ch. 355, 43 Stat. 659.  That provision is now supplanted by Section 20701, which preserves the language of "parts and appurtenances" of a "locomotive" and its "tender."  49 U.S.C. § 20701.

[3] This provision, along with other sections conferring regulatory authority to the Interstate Commerce Commission (later supplanted by the FRA), also establishes the field preemptive scope of the LIA over state law causes of action, whether arising from statute or common law.  *See Napier*, 272 U.S. at 611; *Kurns v. R.R. Friction Prod. Corp.*, 565 U.S. 625, 630 n.2, 632, 634 (2012).  This Court need not reach, however, the question of whether the term "parts and appurtenances" (and its construal under *Southern Railway Company v. Lunsford*, 297 U.S. 398 (1936)) defines the full breadth of field preemption under the LIA.  The Fifth Circuit and the Ninth Circuit have concluded that *Lunsford* does not affect the scope of field preemption under the LIA.  *See Missouri Pac. R. Co. v. R.R. Comm'n of Texas*, 833 F.2d 570, 576 (5th Cir. 1987) ("[*Lunsford*] does not stand for the proposition that under the Locomotive Boiler Inspection Act state attempts to regulate are preempted only to the extent they prescribe 'integral or essential' equipment of a complete locomotive."); *Marshall v. Burlington N., Inc.*, 720 F.2d 1149, 1152 (9th Cir. 1983) ("*Lunsford* in no way affects our holding that the Boiler Inspection Act preempts any state regulation of locomotive equipment.").  However, under Second Circuit precedent, whatever is a "part" or "appurtenance" is encompassed within that field and is thus preempted.  *See Oglesby v. Delaware & Hudson Ry. Co.*, 180 F.3d 458, 461 (2d Cir. 1999) (citing *Lunsford* to describe how it "expounded upon the extent of the [LIA]").

[4] 49 C.F.R. § 229.7 states, in relevant part, that:

> (a) Federal Rail Safety Laws (49 U.S.C. 20701–20703) make it unlawful for any carrier to use or permit to be used on its line any locomotive unless the entire locomotive and its appurtenances—
>
> > (1) Are in proper condition and safe to operate in the service to which they are put, without unnecessary peril to life or limb; and

*Admin.*, 40 F.4th 646, 659 (D.C. Cir. 2022) (referencing the two provisions in tandem); *Straub v. BNSF Ry. Co.*, 909 F.3d 1280, 1285, 1287 (10th Cir. 2018) (construing and analyzing the term "appurtenance" for claims under statute and regulation in tandem regarding a faulty seat adjustment mechanism and stating that Section 229.7 "reiterat[es] the duties LIA imposes on railroad operators"); *Scarpa v. Providence & Worcester R.R., Inc.*, 2020 WL 4449788, at *3 (D. Conn. Aug. 3, 2020) (reading the two provisions in tandem).

Section 20701 and the LIA do "not purport to confer any right of action upon injured employees." *Urie v. Thompson*, 337 U.S. 163, 188 (1949). The action under the LIA, instead, arises under FELA. *Id.*; *see also* 45 U.S.C. § 51 (providing a cause of action of negligence for employees of a common carrier railroad). The LIA "supplements [FELA] by imposing on interstate railroads 'an absolute and continuing duty' to provide safe equipment." *Urie v. Thompson*, 337 U.S. at 188 (quoting *Lilly v. Grand Trunk W. R. Co.*, 317 U.S. 481, 485 (1943)). A violation of the LIA, in and of itself, establishes negligence under FELA by "what is sometimes called negligence per se," and "substitut[es] the comparatively light burden of

---

(2) Have been inspected and tested as required by this part.
(b) Any person (including but not limited to a railroad; any manager, supervisor, official, or other employee or agent of a railroad; any owner, manufacturer, lessor, or lessee of railroad equipment, track, or facilities; any employee of such owner, manufacturer, lessor, lessee, or independent contractor) who violates any requirement of this part or of the Federal Rail Safety Laws or causes the violation of any such requirement is subject to a civil penalty of at least $976, but not more than $31,928 per violation, except that: Penalties may be assessed against individuals only for willful violations, and, where a grossly negligent violation or a pattern of repeated violations has created an imminent hazard of death or injury to persons, or has caused death or injury, a penalty not to exceed $127,712 per violation may be assessed. Each day a violation continues shall constitute a separate offense. FRA's website at www.fra.dot.gov contains a statement of agency civil penalty policy.
(c) Any person who knowingly and willfully falsifies a record or report required by this part is subject to criminal penalties under 49 U.S.C. 21311.
49 C.F.R. § 229.7.

proving violation of their prohibitions for the heavier one of proving negligence." *Id.* at 189; *see also Morant v. Long Island R.R.*, 66 F.3d 518, 523 (2d Cir. 1995) ("It is well-settled that the FELA requires a finding of negligence per se when there has been a violation of a safety statute specifically aimed at the railroad industry." (citation omitted)).  It thus "dispens[es] . . . the employee's burden of proving negligence in certain classes of [FELA] suits." *Urie*, 337 U.S. at 190; *see also Holfester v. Long Island R. Co.*, 360 F.2d 369, 372 (2d Cir. 1966) ("[T]he liability imposed by the Boiler Inspection Act is absolute and is not dependent upon a finding a negligence on the part of the Railroad."); *Ford v. New York, N.H. & H.R. Co.*, 54 F.2d 342, 343 (2d Cir. 1931) (holding that under the Safety Appliance Act and the BIA that "it is not necessary to prove negligence"); *Straub*, 909 F.3d at 1283 ("Unlike FELA, where proof of negligence is required, LIA imposes on railroad carriers an absolute duty to maintain the locomotive in proper condition and safe to operate.").  Moreover, "in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee," the railroad cannot allege defenses of  contributory negligence and assumption of risk.  *Urie*, 337 U.S. at 188 (quoting FELA); *see also* 45 U.S.C. § 53 ("[N]o such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."); 45 U.S.C. § 54 ("[N]o employee shall be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.").  As for causation, a defendant's liability under FELA for a violation of the LIA may be submitted to a jury if the violation "played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri*

*Pac. R.R.*, 352 U.S. 500, 506 (1957); *see also Oglesby v. S. Pac. Transp. Co.*, 6 F.3d 603, 606 (9th Cir. 1993).

A carrier may "violate the [LIA] in one of two ways.  First, it may fail to comply with the regulations promulgated by the Federal Railroad Administration. . . .  The Act also imposes a broader duty on carriers to keep all the parts and appurtenances of their locomotives in proper condition and safe to operate without unnecessary peril to life or limb.  Thus, *even if a carrier complies with the regulations*, it may still violate the Act if the parts or appurtenances of its locomotives are otherwise unsafe." *Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088, 1091 (4th Cir. 1987) (emphasis added) (citing cases); *see also McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 298–99 (7th Cir. 1996) (same); *Herold v. Burlington Northern Inc.*, 761 F.2d 1241, 1246 (8th Cir. 1985) ("The argument that there can be no violation of the Act absent a violation of some regulation or order of the Interstate Commerce Commission or Federal Railroad Administration is without merit.").

## II.    Whether an Air Conditioning Unit Constitutes a "Part" or "Appurtenance" of a Locomotive Under the LIA

The principal question on this motion is whether Plaintiff has adduced sufficient facts to establish that Defendant violated the LIA so as to present this theory of FELA liability to the jury.  The parties do not dispute that Defendant acted in conformance with applicable regulations promulgated by the FRA concerning A/C units.  The lone regulation cited in Plaintiff's complaint, 49 C.F.R. § 229.119, requires that locomotives be equipped with A/C units in the locomotive cab compartments, and that those A/C units are "inspected and maintained to ensure that [they] operate[ ] properly and meet[ ] or exceed[ ] the manufacturer's minimum operating specifications during the periodic inspection required for the locomotive."  49 C.F.R. § 229.119(g), (h).  But the FRA chose to impose those requirements only on locomotives placed

in service for the first time on or after June 8, 2012.  *Id*. § 229.119(g).  It is undisputed that Train 6659 was commissioned on or around 2001 and so the regulation does not apply to it.[5]  Where Plaintiff and Defendant part company, however, is whether the A/C unit is an "integral" or "essential" component of the locomotive or its tender such that its failure to operate as intended establishes negligence *per se* and the defenses of contributory negligence and assumption of risk are unavailable.

Defendant argues that an A/C unit does not qualify as a "part" or "appurtenance" under the LIA.  Dkt. No. 37 at 6–9.  Principally citing *Illinois Cent. R. Co. v. Brent*, 133 So. 3d 760 (Miss. 2013), Defendant argues that the "air conditioner is not an essential part of the locomotive and therefore does not qualify as a part which requires the LIA standard."  Dkt. No. 37 at 9. Plaintiff contends that the A/C unit was a "part" or "appurtenance" because "once NJT chose to install the air conditioning unit in that locomotive, under the LIA[,] NJT became responsible to keep that unit in proper working condition such that the locomotive was safe to operate without unnecessary danger of personal injury."  Dkt. No. 39 at 4.  Citing non-Second Circuit precedent, Plaintiff argues that "parts and appurtenances" include "a variety of items" which railroads choose to install but are not required under federal regulations.  *Id*. at 6–8.

Defendant's argument has some intuitive appeal.  If Defendant is not required by regulation to install an A/C unit in the locomotive, then arguably it should not be required by the LIA to maintain an installed A/C unit.  However, the argument is ultimately unavailing.

The controlling precedent from the Supreme Court on the term "parts and appurtenances" is *Southern Railway Company v. Lunsford*, 297 U.S. 398 (1936).  There, a train driver lost his

---

[5] For this reason, the Court grants summary judgment that a violation of 49 C.F.R. § 229.119(h) cannot show negligence under FELA.  *See also supra* note 1.

life when his train overturned.  At issue was a device called a "Watchman" that, upon the wheels

of the train leaving the track, was supposed to automatically set the brakes.  *Id.* at 398–99.  The

Court found that "the device is not regarded as an essential or integral part" because the relevant

testimony established that "use of the device cannot possibly endanger the operation of the train"

and that it "sometimes works and sometimes will not work, and that it cannot be relied upon with

any degree of certainty."  *Id.* at 400 (internal quotation marks omitted).  The Court thus

concluded that the Watchman was not a "part" or "appurtenance" that subjected the railroad to

absolute liability and reversed the district court's judgment in favor of plaintiff.  *Id.* at 398, 400–

02.  The Court held that:

> With reason, it cannot be said that Congress intended that every gadget placed upon
> a locomotive by a carrier, for experimental purposes, should become part thereof
> within the rule of absolute liability.  So to hold would hinder commendable efforts
> to better conditions and tend to defeat the evident purpose—avoidance of
> unnecessary peril to life or limb.  *Whatever in fact is an integral or essential part
> of a completed locomotive, and all parts or attachments definitely prescribed by
> lawful order of the Interstate Commerce Commission, are within the statute.*  But
> mere experimental devices which do not increase the peril, but may prove helpful
> in an emergency, are not.  These have not been excluded from the usual rules
> relative to liability.

*Id.* at 402.  The Court, then, sought to avoid imposing absolute liability under the statute for

those devices that were "experimental" as to do so would "hinder commendable efforts to better

conditions."  *Id.*  The case stands for the proposition that absolute liability attaches to those

"part[s] of a completed locomotive" that are "integral or essential," or those that are "definitely

prescribed by lawful order of the Interstate Commerce Commission," which was subsequently

replaced by the FRA through the establishment of the Department of Transportation, *see*

Department of Transportation Act § 6(e)¸ 80 Stat. 931, 939 (Oct. 15, 1966).

    The Second Circuit decisions to have addressed the LIA or the BIA have not explicitly

addressed the meaning of "integral or essential part of a completed locomotive."  *Lunsford*, 297

U.S. at 402.  Three of the cases concerning defective equipment do not address whether they involved a "part" or "appurtenance."  *See Ford*, 54 F.2d at 343 (holding pre-*Lunsford* that grease on a handhold, required to be maintained "in good repair" by Interstate Commerce Commission order, did not violate BIA); *Calabritto v. New York, New Haven & Hartford R.R. Co.*, 287 F.2d 394, 395 (2d Cir. 1961) (holding that the BIA created statutory liability for dangerous conditions caused by the temporary presence of sand and oil on the platform of a locomotive without considering whether the platform was the locomotive or a part or appurtenance of that locomotive); *Whelan v. Penn Central Co.*, 503 F.2d 886, 890–91 (2d Cir. 1974) (following *Calabritto* and holding that the presence of foreign matter, such as ice, on the rear steps of the locomotive, could render the locomotive "unsafe to operate in such a manner as to create unnecessary peril to life or limb" in violation of the BIA without considering whether the step assembly constituted a part or appurtenance of the locomotive).  None of those cases discuss *Lunsford*.  In two additional cases, the Second Circuit concluded that the plaintiff had established a part or appurtenance was not reasonably safe without addressing the standards to be applied to determine whether that part or appurtenance was "essential or integral."  In *Bolan v. Lehigh Valley R. Co.*, 167 F.2d 934 (2d Cir. 1948), the court stated summarily that the pilot step on a locomotive was an appurtenance of the locomotive's engine, such that the failure to maintain it in proper condition and in a manner that was safe to operate without unnecessary danger could give rise to liability under the BIA.  *Id.* at 936.  In *Holfester v. Long Island R. Co.*, 360 F.2d 369 (2d Cir. 1966), the part at issue was a fuse box and its cover and latch which exploded and thereby caused injury to the plaintiff.  *Id.* at 370–71.  Although the court stated that it was satisfied that the evidence supported that the car at issue was "a locomotive and that the fuse, the fuse box, its contents, cover, latch and other attachments were parts and appurtenances of the

locomotive, one or more of which were in improper condition and unsafe to operate 'in the service to which the same were put,' and that the plaintiff's injuries were proximately caused by such defects," it did not explain how it reached that conclusion or what made the fuse box a "part" or "appurtenance." *Id*. at 372.  Neither case cited or discussed *Lunsford*.

The Circuit Courts which have addressed the meaning of "an integral or essential part of a completed locomotive," *Lunsford*, 297 U.S. at 402, have adopted somewhat differing approaches.  In *Herold*, 761 F.2d 1241, the court held that an amber rotating beacon attached to a locomotive at the factory constituted an integral or essential part of the locomotive, notwithstanding that federal law and regulation did not require its installation and that the locomotive could mechanically operate without its presence.  *Id*. at 1245–46.  The FRA required only a headlight and whistle on locomotives and the defendant railroad had removed the beacon for repairs.  *Id*.  The court appears to have relied on the fact that amber rotating beacons were effective safety devices and that the railroad had already made the decision to install them in concluding that they were integral and essential.  *Id*. at 1246–47.

By contrast, in *McGinn*, 102 F.3d 295, the court held that a luggage rack, the absence of which in the engine cab caused plaintiff's injuries, was not an integral or essential part of a completed locomotive.  *Id*. at 299.  The court reasoned that it was "not a mechanical component essential to the operation of a locomotive."  *Id*.  The court noted that the defendant railroad had neither installed nor agreed to install a luggage rack, but its decision did not turn on any distinction based on the failure to install as opposed to the failure to maintain.  The court stated that "[e]ven if Burlington had installed or agreed to install luggage racks, . . . such actions would not automatically render luggage racks an essential part of a locomotive."  *Id.*  Nor would it have been sufficient that the absence of the luggage rack rendered the locomotive unsafe, as "the BIA

[does not] demand[ ] that liability ensue in every case in which a plaintiff alleges that a carrier's failure to install some piece of equipment on a locomotive rendered the locomotive unsafe." *Id.*

Other decisions—which arise generally from failure to install claims—simply assert that "the term 'parts and appurtenances' does not include every item of equipment that conceivably could be installed on a locomotive" or that is necessary for the locomotive to be safe without providing any standard for what is essential and integral and what is not. *Mosco*, 817 F.2d at 1091–92 (rejecting argument that screens, bars, grates, and similar devices on window of locomotive's cab were an "integral and essential part" because of objects thrown through the window and because it was often necessary to operate the locomotive with its windows open); *see also King v. S. Pac. Transp. Co.*, 855 F.2d 1485, 1486 (10th Cir. 1988) (rejecting argument that armrests and seatbelts on the chair for railroad brakeman which had not been installed were essential and integral to the operation of the railroad).

The Tenth Circuit adopted yet a further approach in *Straub*, 909 F.3d 1280. The defect at issue in *Straub* was in the adjustment mechanism on the engineer's seat. The defect did not violate FRA regulations nor was the adjustment mechanism itself easily characterized as essential or integral to the operation of the locomotive. The engineer's chair was the subject of regulation and the mechanism "allow[ed] the chair to comply with the regulatory requirement that the chair be 'securely mounted and braced' to the locomotive." *Id.* at 1288–89 (citing 49 C.F.R. § 229.119(a)). Still, the court found that the plaintiff sufficiently pleaded that the mechanism was integral or essential and that the complaint sufficiently alleged a violation of the LIA. The court distinguished between failure to install claims where the railroad is sought to be held liable for the failure to install additional safety devices which the FRA had not required and failure to maintain claims where an already installed piece of equipment fails to operate with

14

unnecessary danger of personal injury.  In the former case, where the claim is one of failure to install, it is "perfectly natural" for a court "to focus narrowly on the safety item that it is alleged the railroad improperly omitted from a locomotive" and to consider whether it is essential and integral.  *Id.* at 1290.  The failure to install the adjustment mechanism might not have resulted in the absence of a part that was integral or essential to the completed locomotive.  However, in the latter case, where the carrier installed a part but failed to maintain it, the court should not "break down" the item of equipment "into its component parts or subsidiary functions" but rather should consider whether the already-installed equipment itself and as a whole was safe to operate.  *Id.* Implicitly ruling that the engineer's seat—the subject of regulation—was integral or essential, the failure to maintain the part that was necessary for the seat to function constituted a violation of the LIA.[6]

As previously noted, the FRA issued new "Locomotive Safety Standards" on April 9, 2012.  *See* Locomotive Safety Standards, 77 Fed. Reg. 21312-01 (Apr. 9, 2012).  "The final rule

---

[6] *Straub* cites a variety of cases to support the proposition that "a railroad carrier's failure to maintain its engineer's chair in a safe condition constitutes a violation of LIA's general duty to maintain a locomotive, as well as its parts and appurtenances, in safe condition."  *Straub*, 909 F.3d at 1290.  The cases generally do not turn on the notion that the defect at issue constituted a violation of 49 C.F.R. § 229.119(a).  In the few instances where the carrier violated the regulation, the violation appears to be happenstance.  *See Spade v. CSX Transp., Inc.*, 2004 WL 2980740, at *4 (W.D. Mich. Jan. 30, 2004) (concluding that § 229.119(a) was violated "because the weld holding the side and back supports together was broken"); *Clemons v. Burlington N. Santa Fe Ry.*, 2016 WL 10586284, at *11 (C.D. Cal. Apr. 8, 2016) (citing *Spade* and concluding similarly that summary judgment was improper).  Rather, the point for which *Straub* cites the cases is that the chair itself is integral or essential.  Where that point is not just merely asserted, *see, e.g.*, *Oglesby v. S. Pac. Transp. Co.*, 6 F.3d 603, 610 (9th Cir. 1993); *Kleeberg v. Norfolk S. Ry. Co.*, 2001 WL 914460, at *3 (N.D. Ill. Aug. 13, 2001), it is supported by the regulation as evidence that the chair itself is a part or appurtenance which the carrier is obligated to maintain at risk of violating the LIA, *see, e.g.*, *Stevenson v. Union Pac. R. Co.*, at *2 (E.D. Ark. Jan. 20, 2009); *Terrell v. Soo Line R. Co.*, 2005 WL 4882750, at *4 n.6 (S.D. Ind. Sept. 1, 2005).  Those cases do not show that a *violation* of § 229.119(a) is necessary to establish the appropriate level of generality as to what is regulated.

incorporates existing industry and engineering best practices related to locomotive and locomotive electronics." *Id.* at 21312.[7]  The Final Rule makes clear that a functioning temperature control system in the cab is essential to the safe operation of the locomotive.  It states that "[c]urrent literature regarding the effect of low temperature on human performance indicates that performance decreases when the temperature decreases below 60 °F.  Similarly, the literature regarding the effect of high temperature and humidity indicates that performance decreases when temperatures increase above 90 °F, and that performance decreases to an even greater extent when the temperature increases above 90 °F." *Id.* at 21319.  Put in plain language, a train is hazardous to operate when the engineer either is unable to think clearly because of exposure to extreme cold or passes out as a result of exposure to extreme heat.[8]  The Final Rule also makes clear that there are a number of measures—not simply an A/C unit—that a carrier could implement to control cab temperature, including "isolation from heat sources such as the prime mover; reduced emissivity of hot surfaces; insulation from hot or cold ambient

---

[7] The section on the "Statutory and Regulatory Background" in the Final Rule states: "The statute is extremely broad in scope and makes clear that each railroad is responsible for ensuring that locomotives used on its line are safe. Even the extensive requirements of part 229 are not intended to be exhaustive in scope, and with or without that regulatory structure, the railroads remain directly responsible for finding and correcting all hazardous conditions. For example, even without these regulations, a railroad would be responsible for repairing an inoperative alerter and an improperly functioning remote control transmitter, if the locomotive is equipped with these devices."  77 Fed. Reg. at 21315.

[8] As the FRA put it, "Locomotive crew performance is directly linked to railroad safety through the safe operation of trains.  Locomotive engineers are responsible for operating trains in a safe and efficient manner.  This requires the performance of cognitive tasks, including the mathematical information processing required for train handling, constant vigilance, and accurate perception of the train and outside environment.  Conductors are responsible for maintaining accurate train consists, including the contents and position of hazardous materials cars, for confirming the aspects and indications of signals, and for ensuring compliance with written orders and instructions.  A decrease in performance of any of these tasks that can be anticipated from relevant scientific findings should be avoided where amelioration can be applied."  77 Fed. Reg. at 21319.

environments; heat radiation shielding including reflective shields, absorptive shielding, transparent shielding, and flexible shielding; localized workstation heating or cooling; general and spot (fan) ventilation; evaporative cooling; chilled coil coiling systems." *Id*.

Plaintiff has adduced sufficient evidence to go to the jury on a theory that Defendant violated FELA by violating the LIA because, much like the engineer's chair in *Straub*, a temperature control system is an "essential and integral" part of a completed locomotive. *See id.* (FRA identifying the "health and safety effects of temperature extremes," and stating that it "expects reliance on engineering controls to limit temperature extremes" because of the "captive" nature of the engineer's workplace); *see also* Dkt. No. 39-1 ¶ 1 (Chief Train Master recalling instances in which NJT engineers required "medical assistance" after operating in cabs with an ambient temperature over 100 degrees). The absence of a functioning temperature control system "endanger[s] the operation of the train" and "increase[s] the peril." *Lunsford*, 297 U.S. at 400, 402. Defendant was not required by rule or regulation of the FRA to install an A/C unit in the locomotive cab. It could have used alternative mechanisms as its system to control cab temperature. *See Baltimore & O. R. Co. v. Groeger*, 266 U.S. 521, 530 (1925) ("The [BIA] required a condition which would permit use of the locomotive without unnecessary danger. It left to the carrier the choice of means to be employed to effect that result."). It chose to use an A/C system. If, as the evidence here permits, it is that A/C system that allowed the locomotive to have a functioning system to control cab temperature, the carrier then may be held to be negligent *per se* under the LIA and FELA for the failure of its functioning. *See Herold*, 761 F.2d at 1246 ("[O]nce any part or appurtenance is attached to a locomotive, the Boiler Inspection Act requires it be maintained in good repair at all times"); *Calabritto*, 287 F.2d at 395–96 ("The absence of such a rule, which would only be declaratory of common sense, can make no

17

difference to the jury's right to reach such a conclusion [that there was a violation of the LIA]."). In short, following *Straub* and (to some extent *Herold*), it is a fair inference that Defendant thus made the A/C unit a component part of its temperature control system which itself was essential and integral to the completed locomotive. The FRA undoubtedly could penalize a railroad which, having relied on an A/C system to control temperature in the cab, failed to maintain it, causing an accident with resulting loss of life and limb to passengers and trainmen alike. The result is no different when, through FELA, Plaintiff asserts a violation of LIA. If Defendant made the decision to create a temperature control system based on an A/C unit, Defendant was obligated to make sure that such system was "in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701; *see also Straub*, 909 F.3d at 1290 (noting that courts should not engage in a "reductive mode of analysis" that would "serve only to minimize the applicability of the LIA by reducing every piece of equipment on a locomotive down to its most basic component parts and, thereby, making it less likely such components are essential or integral to a completed locomotive").

Plaintiff has adduced sufficient evidence that Defendant's temperature control system was not in a proper condition and safe to operate without unnecessary danger of personal injury. It is undisputed that the temperature in the cab reached 114 degrees. Dkt. No. 39-1 ¶¶ 1–2. The A/C unit had been reported inoperable six weeks earlier and was inoperable at the time of the incident. *Id.* ¶ 1. The Chief Train Master was aware of prior instances of engineers requiring medical assistance after operating a train when the ambient temperature was above one hundred degrees. *Id* ¶ 2. Assuming that Plaintiff shows that the A/C unit was not in proper condition and safe to operate, it will have established a basis for absolute liability under the LIA.

Defendant's authority to the contrary is unpersuasive.  Defendant relies primarily on *Illinois Cent. R. Co. v. Brent*, 133 So. 3d 760 (Miss. 2013), which in turn relies on *Mosco*, 817 F.2d 1088.  The court in *Brent*, citing *Mosco*, stated that "the Fourth Circuit Court of Appeals has held that an air conditioning unit does not fit within the scope of 'parts and appurtenances' as defined by the United States Supreme Court."  *Brent*, 133 So. 3d at 769.  But the *Mosco* court did not address whether a temperature control system or an A/C unit was essential or integral to a completed locomotive.  It addressed whether "bars, screens, grates, or similar protective devices" were essential, holding in a conclusory manner that "in [their] opinion, they [were] not."  *Mosco*, 817 F.2d at 1091.  There is nothing in *Mosco*, and therefore nothing in *Brent*, that supports the notion that a carrier can install an A/C unit in a cab and then fail to maintain it without incurring absolute liability under the LIA.  For these reasons, Defendant's motion for summary judgment on the LIA claim is denied.

## III.   The Preclusive Effect of the FRSA and FRA Regulations

Defendant also argues that the FRSA, and FRA regulations promulgated thereunder, preclude Plaintiff's FELA claim.  *See* Dkt. No. 37 at 10–11.  Plaintiff, citing *Pom Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014), and decisions from this District, argues that Defendant's preclusion argument has been "rendered invalid." Dkt. No. 39 at 9–17.  For the following reasons, the Court agrees with Plaintiff that its FELA claim is not precluded by the FRSA or its regulations.

Both parties dispute the applicability of *Pom Wonderful* to the interaction between the FRSA and FELA.  *Pom Wonderful* involved the interaction of two federal statutes—the Federal Food, Drug, and Cosmetic Act ("FDCA") and the Lanham Act.  *Pom Wonderful*, 573 U.S. at 106.  The plaintiff had brought a Lanham Act claim against Coca-Cola, arguing that one of its drinks misled consumers into believing that the product consists predominantly of blueberry and

pomegranate juice, when in fact only .5% of the drink was made of those juices. *Id.* at 105, 110.
The Supreme Court reversed the Ninth Circuit's holding that a Lanham Act claim is precluded
by the FDCA, which forbids the misbranding of food, including by means of false or misleading
labeling. Drawing from the "text, history, [and] structure of FDCA [and] the Lanham Act," the
Supreme Court concluded that the two statutes complement one another. *Id.* at 106. After
initially determining that the text of neither statute specifically addressed the other statute, the
Court then concluded that the "structures" of the statutes "reinforce the conclusion drawn from
the text." *Id.* at 115. The purposes of the statutes also differed, with the Lanham Act protecting
"against unfair competition," and the FDCA "protect[ing] . . . safety." *Id.* The remedies were
also distinguishable in terms of public and private enforcement. *Id.* The Court rejected
defendant's arguments that the preemption provisions and delegation of enforcement authority to
the U.S. government in the FDCA indicate an intent to ensure uniform standards that preclude
other federal causes of action. *Id.* at 116–17.

On the specific question of the interaction between the FRSA and FELA, this Court does
not write on a blank slate. Most notably, the Honorable Gregory H. Woods from this District has
persuasively written on why the FRSA does not preclude FELA claims. *See Henderson v. Nat'l
R.R. Passenger Corp.*, 87 F. Supp. 3d 610 (S.D.N.Y. 2015). The defendant in *Henderson* cited
the same three cases from the Fifth, Sixth, and Seventh Circuits that Defendant cites here.
*Compare id.* at 614 (citing *Nickels v. Grand Trunk Western R.R., Inc.*, 560 F.3d 426 (6th Cir.
2009); *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439 (5th Cir. 2001); *Waymire v. Norfolk & W. Ry.
Co.*, 218 F.3d 773 (7th Cir. 2000)), *with* Def. Reply Br. at 8–9 (citing the same cases). The
*Henderson* court noted that all three cases "predate the Supreme Court's decision in *Pom
Wonderful*," and that it would otherwise "rewrite the express statutory language of the FRSA by

inferring that its regulations preclude covered federal claims under the FELA, in addition to covered state law claims." *Henderson*, 87 F. Supp. 3d at 616. The additional state and district court cases that Defendant cites also predate *Pom Wonderful*. *See* Dkt. No. 37 at 10–11 (citing state cases from Georgia, Alabama, and a federal case from the Eastern District of Arkansas).

This Court agrees with the conclusion in *Henderson*—which maps directly onto the reasoning of *Pom Wonderful*—that Congress "did not clearly express an intent to preclude FELA claims" and to infer such an intent would rewrite FRSA. *Henderson*, 87 F. Supp. 3d at 616; *see also Hananburgh v. Metro-N. Commuter*, 2015 WL 1267145, at *2 (S.D.N.Y. Mar. 18, 2015) (concurring with *Henderson* as to why the Fifth, Sixth, and Seventh Circuits are incorrect). Defendant does not address this caselaw in his initial brief and fails to adequately refute it in his reply brief, instead primarily reciting the reasoning and the rationale of *Waymire* and *Lane*. *Waymire*, however, relied extensively on preemption analysis to reach its conclusion of preclusion—an approach that the Supreme Court distinguished in *Pom Wonderful*. *See Pom Wonderful*, 573 U.S. at 111 ("[T]his is not a pre-emption case. . . . So the state-federal balance does not frame the inquiry."). *Waymire*'s reference to the FRSA's preemption clause is similarly inapplicable as "[t]his provision must be read in the context in which it appears: a section of the statute exclusively addressing the preemption of state law." *Henderson*, 87 F. Supp. 3d at 616 (refuting the clause directing that laws of railroad safety be "nationally uniform to the extent practicable" in 49 U.S.C. § 20106(a)(1)). *Lane* adopts similar reasoning and is thus also unpersuasive.

As in *Pom Wonderful*, the text, structure, and purpose of the FRSA and FELA are not mutually exclusive. There is no contention that FRSA's text addresses FELA. FRSA and FELA also both address different statutory purposes and impose different standards of care for certain

plaintiffs.  As noted in *Henderson*, "holding railroads to a standard of care with respect to their employees that is higher than the state law standards applicable to the general public is precisely the purpose of the FELA."  *Id*. at 617.  Importantly, like the Lanham Act and the FDCA, the two schemes within the FRSA and FELA can be construed together.  Violations of FRSA regulations would constitute "negligence *per se*" and compliance would provide non-dispositive evidence of "due care."  *Id*.  The purpose and scheme of the two statutes can and must be construed in tandem.

This approach aligns with Supreme Court guidance on how to construe the interaction between federal statutes.  When faced with two possibly conflicting federal statutes, a court must, if at all possible, construe them "to give effect to each if we can do so while preserving their sense and purpose."  *Watt v. Alaska*, 451 U.S. 259, 267 (1981).  As the Supreme Court has stated, "we are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."  *Morton v. Mancar*, 417 U.S. 535, 551 (1974).  A court is obligated to construe federal statutes *in pari materia* and to "construe a statute to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law."  *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991); *see also Cortese v. Skanska Koch, Inc.*, 2021 WL 429971, at *10 (S.D.N.Y. Feb. 8, 2021).

Finally, Plaintiff's reliance on *Monheim v. Union R.R. Co.*, 788 F. Supp. 2d 394 (W.D. Pa. 2011), is unavailing.  In that case, the court held that a plaintiff could not maintain a claim under FELA for failure to install equipment that the LIA did not require be installed.  *Id*. at 398, 401.  In this case, by contrast, Plaintiff does not allege negligence in the failure to install an A/C

unit that the FRA did not require be installed, but in the failure to inspect, maintain, and repair the A/C unit once it had been installed, and failure to determine that the locomotive was safe to operate with an inoperable A/C unit.  Dkt. No. 1 ¶ 20.  The fact that Defendant may have had no duty to install the A/C unit in the first place thus does not give it an excuse to unreasonably ignore defects in the already-installed A/C unit that gave rise to Plaintiff's injury.  *See King*, 855 F.2d at 1488 n.1, 1489 (distinguishing between failure to maintain and failure to install claims, explaining the difference in liability between the LIA and FELA, and noting that "[l]iability under the FELA is premised on the railroad's negligence, however small" and that "BIA imposes on the carrier an absolute duty to maintain the locomotive").  For these reasons, the motion for summary judgment on Plaintiff's FELA claim on the basis of preclusion is denied.

## CONCLUSION

The motion for summary judgment is GRANTED in part and DENIED in part.

The Clerk of Court is respectfully directed to close Dkt. No. 36.


SO ORDERED.


Dated: December 23, 2022
     New York, New York

                             LEWIS J. LIMAN
                        United States District Judge